## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| ALARM.COM INCORPORATED and ICN ACQUISITION, LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CASE NO.:  2:17-cv-0608-JRG ) |
| IPDATATEL, LLC, | ) **JURY TRIAL DEMANDED** ) |
| Defendant. | ) ) ) |

## SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT
## AND DEMAND FOR JURY TRIAL

Pursuant to Section 1338 of Title 28 of the United States Code and Rule 15 of the Federal Rules of Civil Procedure, Plaintiffs Alarm.com Incorporated ("Alarm.com") and ICN Acquisition, LLC ("ICN") allege for their Complaint against ipDatatel, LLC ("ipDatatel" or "Defendant"), on personal knowledge as to Alarm.com and ICN's own actions and on information and belief as to the actions of others, as follows:

1.      This Complaint arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has subject matter jurisdiction over this action under 35 U.S.C. § 271 *et seq.*, 28 U.S.C. §§ 1331 and 1338(a).

## THE PARTIES

2.      Plaintiff Alarm.com is a Delaware corporation having its principal place of business at 8281 Greensboro Drive, Suite 100, Tysons, Virginia, 22102.

3.      Plaintiff ICN is a Delaware limited liability company having a registered agent at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

4.     Defendant ipDatatel is a Texas limited liability company having its principal

place of business at 13110 Southwest Freeway, Sugar Land, Texas 77478.  ipDatatel may be

served via its registered agent for service of process: Cynthia Moulton, 800 Taft Street, Houston,

Texas, 77019.

## JURISDICTION AND VENUE

5.     The Court may exercise personal jurisdiction over Defendant because Defendant

has continuous and systematic contacts with the State of Texas and does business in this District.

In addition, Defendant has a regular and established place of business in this District.

6.     ipDatatel conducts business in this district by importing, marketing, offering for

sale, and selling its infringing products in this District.  These infringing products include, but

are not limited to, products that practice the subject matter of the Patents-in-Suit, including,

without limitation, ipDatatel's alarm communicators, including but not limited to BAT LTE,

BAT CDMA, BAT CDMA-WIFI, CAT CDMA, CAT XT, and BAT WIFI, ipDatatel's

"SecureSmart Helix Platform," ipDatatel's  Cloud Video Services for IP Cameras, and

ipDatatel's mobile applications, including but not limited to its "SecureSmart" alarm application

for Android and iOS (collectively, "the Accused Products").  Various combinations of the

aforementioned products are packaged and sold under a variety of service plans, including

without limitation, "Alarm Transmission," "Alarm Notifications," "Interactive Services," and

"Panel Downloading."

7.     ipDatatel offers home security services in this District that practice the subject

matter of the Patents-in-Suit.

8.     Because Defendant has availed itself of the privileges of conducting business

activities in this District, it is subject to personal jurisdiction in this District.

9. Because Defendant conducts substantial business in this District, directly or through intermediaries, including by (i) representing, internally or externally, that Defendant has a presence in this District; (ii) deriving benefits from its presence in this District, including, without limitation, by deriving substantial revenue from goods and services provided to individuals in this District; and (iii) interacting in a targeted way with existing or potential customers, consumers, users, or entities within this District, venue is proper in this District.

10. Venue is proper in this judicial District pursuant to 28 U.S.C. § 1400(b) because ipDatatel was formed as a limited liability company (or LLC) in the State of Texas and therefore resides in Texas for the purposes of venue.

11. Venue is also proper in this judicial District pursuant to 28 U.S.C. § 1400(b) because, on information and belief, ipDatatel has a regular and established place of business in this District, has committed acts of patent infringement in this District, and continues to commit acts of infringement in this District.

## FACTUAL BACKGROUND

12. Alarm.com and ICN bring this action to seek injunctive relief and damages arising out of Defendant's infringement of U.S. Patent Nos. 7,113,090; 7,633,385; 7,956,736; 8,478,871; and 9,141,276 (collectively, "the Patents-in-Suit").

## ALARM.COM

13. Alarm.com is a leading technology provider for connected home services, from interactive security and remote video monitoring to energy management and home automation. Alarm.com's customers and partners use Alarm.com's products and technology in their home security, monitoring, management, and automation systems. Alarm.com connects a broad array of smart devices into an integrated ecosystem (Figures 1 and 2), allowing easy access and control

through the intuitive Alarm.com Smart Home Security App (Figure 3).  Alarm.com has

integrated a broad range of devices into its cloud-based platform, including smartphones, the

Apple Watch, the Apple TV, and the Amazon Echo.



**Fig. 1.**



**Fig. 2.**



**Fig. 3.**

14.     Alarm.com's cloud-based technology platform and advanced wireless, mobile, and web-based solutions are sold, set up, and supported exclusively through a nationwide network of licensed and authorized Security and Smart Home service providers.

15.     Founded in 2000, Alarm.com revolutionized security by developing and launching the first wireless interactive security solution in 2003.  This innovative solution provided a new method of remotely monitoring and managing security systems in the home.  Alarm.com remains a pioneer in the security and home automation field to this day.  Its first-to-market innovations include the use of dedicated wireless signaling that is fully integrated into the security control panel and eliminates the line-cutting vulnerability of landline-based security systems, cellular-based fully integrated two-way voice emergency response capability, alerting via text messages and email of non-alarm activity, the ability to raise an alarm condition even when an intruder destroys the physical alarm panel that generates the alarm signal, and home

security apps for major smartphone platforms that allow remote control of security systems from anywhere.

16.     Alarm.com's operations are global, currently spanning North America, South America, and Australia.  Through its award-winning and reliable technology and cloud services and expansive professional services network, Alarm.com provides a wide range of home and business solutions to millions of properties.  These solutions are used across tens of millions of devices and billions of data points.

**ICN**

17.     Plaintiff ICN is a wholly-owned subsidiary of Alarm.com and owner of several of the Patents-in-Suit.

**IPDATATEL**

18.     ipDatatel was founded in 2007 in Texas.  Genesis Park LP invested in ipDatatel in 2013.  ipDatatel is currently headquartered in Texas and offers products and services in all 50 states within the United States, including within the Eastern District of Texas.

19.     ipDatatel offers interactive security capabilities such as interactive home security, video monitoring, environment control, energy management, and alarm monitoring (Figure 4). ipDatatel offers software as a service ("SaaS") alarm transport and interactive services solutions (Figure 5).



**Fig. 4.**



**Fig. 5.**

20.      ipDatatel also engineers and manufactures Internet ready devices for home

security, home automation, video monitoring, environment control, energy management, and

alarm monitoring (Figure 6).  It offers hardwire, wireless, and universal broadband alarm

transceivers that function with alarm panels to provide alarm monitoring communications to

central stations, virtual keypads, and alarm monitoring notifications via text, email, and

computerized voice call (Figures 7 and 8).  The company also operates data centers for Internet

operations and applications.



**Fig. 6.**



**Fig. 7.**

ipDatatel's network is an IP based, cloud-hosted solution designed to deliver redundant, highly reliable and fast, two-way alarm signaling.  Our network has been in operation for close to 10 years, is built to scale, and has proven to be highly reliable.

**DESIGN**

- Distributed computing
- Cloud based hosting with RackSpace and Amazon Web Services (AWS)
- Self Healing
- Redundant and resilient
- Over-the-Air device updates

**SECURITY**

- Mesh Trust Center (MTC)
- Load Balancing
- Network Communication Encryption
- End-Device Communication Encryption

**SIGNALS**

- Contact ID (CID) and Security Industry Association (SIA)
- Flexible Central Station signaling via IP to IP and/or PSTN
- Sur-Guard and XML protocols enabling easy adaptation to any Central stations
- Two-way communications between device and receivers

**NOTIFICATIONS**

- Utilizes Google Cloud Messaging (GCM) and Apple Push Notification Services (APN)

**Fig. 8.**

21.    ipDatatel devices provide a gateway for smart devices, to allow for control of thermostats, lighting, and door locks (Figure 9).



**Fig. 9.**

22.     ipDatatel markets its products through a network of alarm distributors in the United States.

## THE PATENTS-IN-SUIT

23.     As summarized in the following paragraphs of this section, the Patents-in-Suit embody key innovations within the interactive security field.

### The '090 Patent

24.     On September 26, 2006, the United States Patent and Trademark Office (the "USPTO") issued United States Patent No. 7,113,090 ("the '090 patent"), entitled "System and

Method for Connecting Security Systems to a Wireless Device." Alarm.com is the owner and assignee of all right, title, and interest in and to the '090 patent and holds the right to sue and recover damages for infringement thereof, including past damages. A true and correct copy of the '090 patent was attached as Exhibit 1 to the Original Complaint.

25.     Home security systems in existence prior to the inventions of the '090 patent were typically installed at the subscriber's residence with a security panel, multiple security sensors, and a keypad for controlling the system.

26.     When armed, the security panel would communicate certain state changes from security sensors to a central monitoring station.

27.     The inventors of the '090 patent recognized that one of the major shortcomings of such existing home security systems was the inability to communicate "normal activity" to the subscriber. For example, the opening or closing of doors and windows (resulting in a security device changing its state and/or transmitting data) may provide useful information to the subscribers even when the security panel was in an unarmed state.

28.     In certain embodiments, the '090 patent advantageously transmits both alarm events *and normal activity* from the security panel, typically via a radio modem, to a database.

29.     In so doing, the inventors were able to extract additional useful information (normal activity) from, in some embodiments, conventional security panels and security sensors, thereby improving the operation of those security panels and security sensors in an unconventional manner.

30.     The known prior art in the field of home security systems neither taught using normal activity nor expressed any appreciation for the substantial advantages associated with utilizing this data in combination with alarm events. In this regard, transmitting both alarm

events and normal activity was not well-understood, routine, or conventional and stands in sharp contrast to the conventional and routine approach of transmitting only "alarm events."

31.     The inventors also overcame the problems associated with processing and retaining substantial volumes of activity associated with both normal activity and alarm events. This problem is pronounced with normal activity which typically generates substantially more data than alarm events.

32.     In this regard, one of the problems faced by the inventors was necessarily rooted in home security technology specifically arising in the realm of home security systems at a residence.

33.     The ability to effectively process security device information, which includes a combination of normal activity and alarm events, without being overwhelmed with too much data, represented a specific technological improvement to existing home security systems. The ability to effectively process normal activity was not well-understood, routine, or conventional.

34.     The inventors of the '090 patent, in addition to the above, recognized that a home security system would be more effective by allowing a subscriber to establish various "notification preferences."

35.     Indeed, in prior systems, subscribers would be alerted to alarm conditions by phone or, perhaps, not at all.

36.     If the subscriber could not be immediately reached (e.g., the subscriber did not pick-up the landline phone associated with the account) the central station would typically alert the subscriber's local police.

37.     This prior approach resulted in a high occurrence of false alarms.

38.     False alarms are problematic for home security systems because of the time and expense of deploying police to the subscriber's residence.

39.     The '090 patent issued from a patent application, which is a continuation of U.S. Patent No. 6,965,313 ("the '313 patent").

40.     During the prosecution of the '313 patent, the examiner rejected numerous application claims as being anticipated by U.S. Patent No. 6,369,705 ("Kennedy").  As argued by Alarm.com's prosecution counsel:

> In the invention of Kennedy, a subscriber directly notifies the system of an alarm event via the subscriber unit.  When the system of Kennedy receives the alarm event, other subscribers (besides the subscriber notifying the system) within the vicinity of the subscriber are notified of the alarm event.  The system of Kennedy does not implement remote security devices.   In addition, the subscribers of Kennedy receiving the alarm event are notified by a subscriber unit.  As there is only one way of receiving the alarm event, notification preferences are not specified by any subscriber (either reporting the alarm or receiving the alarm) of Kennedy's system.

41.     With the '090 patent, in certain embodiments, a subscriber could establish the circumstances under which notifications are sent to the subscriber and/or the manner under which notifications are sent.  For example, a subscriber could specify that certain normal activity should be sent via email.  Establishing the circumstances under which notifications are sent to a subscriber and/or the manner under which notifications are sent was not well-understood, routine, or conventional.

42.     For example, establishing "notification preferences" based on "user specified information," as recited by claim 40 of the '090 patent was not well-understood, routine, or conventional in light of the prior art systems, such as Kennedy, that the '090 patent improved upon.

43.     A subscriber could also specify that alarm events should be sent via text and/or through an automated telephone call and could establish a hierarchy of multiple individuals to send the alarm notification to before contacting the local police.

44.     Addressing the problem of false alarms due to limited and often ineffective means for alerting subscribers was necessarily rooted in home security technology specifically arising in the realm of home security systems.

45.     Notification preferences may be stored as part of a user database.  Thus, one of the problems faced by the inventors—reducing false alarms through efficient notification based on user preference—was necessarily rooted in improving home security technology specifically arising in the realm of home security systems at a residence.

46.     A skilled artisan would not consider the claim limitations of the '090 patent – either alone or in combination – to recite well-understood, routine, or conventional concepts. Instead, a person of ordinary skill in the art would recognize that the claim limitations of the '090 patent are directed to the inventive concepts described in the specification and prosecution history.

### The '385 and '736 Patents

47.     On December 15, 2009, the USPTO issued United States Patent No. 7,633,385 ("the '385 patent"), entitled "Method and System for Communicating With and Controlling an Alarm System From a Remote Server."  Alarm.com's wholly owned subsidiary ICN is the owner and assignee of all right, title, and interest in and to the '385 patent and holds the right to sue and

recover damages for infringement thereof, including past damages.  A true and correct copy of the '385 patent was attached as <u>Exhibit 2</u> to the Original Complaint.

48.     On June 7, 2011, the USPTO issued United States Patent No. 7,956,736 ("the '736 patent"), entitled "Method and System for Communicating With and Controlling an Alarm System From a Remote Server."  The '736 patent is a continuation of the '385 patent, such that both patents share the figures and written description.  Alarm.com's wholly owned subsidiary ICN is the owner and assignee of all right, title, and interest in and to the '736 patent and holds the right to sue and recover damages for infringement thereof, including past damages.  A true and correct copy of the '736 patent was attached as <u>Exhibit 3</u> to the Original Complaint.

49.     The '385 and '736 patents provide an upgrade unit that allows a user to keep an existing legacy alarm system rather than replacing that system.

50.     Prior to the invention of the '385 and '736 patents, alarm system subscribers had just one option if they wanted to attain certain increased communication capabilities: remove the legacy alarm system and replace it with an entirely new one.

51.     The '385 and '736 patents therefore focused on improving over two prior art systems:  (1) legacy alarm systems and (2) security panels with integrated communication modules.

52.     As depicted in the annotated version of Figure 1 of the '385 and '736 patents, as set forth below, legacy alarm systems commonly consisted of a controller connected by wireless or wired connections to sensors deployed throughout the secured dwelling.



Figure 1

53.     Such a system would further have a keypad that allowed a user to control the operation of the alarm controller, such as arming and disarming the system.

54.     The keypad and alarm controller would be connected by a keypad bus that allowed communication between those components.

55.     These legacy security systems were usually connected to a central monitoring service system via a telecommunications line coupled to a public switched telephone network ("PSTN").

56.     Legacy alarm systems were limited to communicating with an external monitoring service using only the PSTN.

57.     The keypad processor of legacy alarm systems was conventionally coupled to a keypad through which the subscriber can enter commands.

58.     The alarm processor of a legacy alarm system is coupled to the keypad processor through a "keypad bus."

59.     The keypad bus allows the alarm processor and keypad processor to communicate using, for example, a serial digital protocol transmitted and received by the processors.

60.     The '385 and '736 patents explain that several drawbacks to these legacy alarm systems existed.

61.     Typically, the telecommunications line connecting the security system to the central monitoring service system was the occupant's phone line, which was usually accessible from the exterior of the dwelling and could be cut by an intruder.

62.     This created a "single point of failure" that could undermine the effectiveness of the security system, for example preventing notification of authorities in the event of a break-in.

63.     Another identified drawback of legacy alarm systems was that they typically provided only one-way communication, providing only data from the security system to the central monitoring system.

64.     While a legacy alarm system was able to send information to the central monitoring service, a legacy alarm system was unable to receive information or commands from the central monitoring service or any other remote entity, preventing remote control or updating of the system.

65.     Security panels with integrated communication modules overcame the deficiencies of legacy security systems insofar as they provided two-way cellular communication often without a single point of failure.

66.     Such integrated systems had disadvantages.  For instance, if a premise was already equipped with a legacy alarm system, upgrading to add more capabilities or features required replacement of the subscriber's existing security system.

67.      Replacement of a security system entails high costs; the security panel and all the sensors of the original system cannot be repurposed in many instances.

68.     Additionally, a security installer of such systems might prefer to install a single type of security panel for all subscribers regardless of whether or not they intend to utilize the

cellular capabilities.  In that regard, the decreased flexibility of the integrated solution would result in increased costs and/or less efficient installation.

69.     The '385 and '736 patents describe and claim a different solution; namely, providing an upgrade unit that allows a user to enhance a legacy alarm system.  Specifically, a communication unit (including a communications processor) which couples directly to the keypad bus.  Through this coupling, the communications unit transmits and receives information from the security panel as if it were a keypad.  In other words, the '385 and '736 patents utilize the keypad bus in a new and unconventional way to achieve unexpected and useful results.

70.     A communications unit coupled directly to the keypad bus of an legacy alarm system was not well-understood, routine, or conventional.

71.     Transmitting and receiving information from a security panel by a communications unit coupled to a keypad bus was not well-understood, routine, or conventional.

72.     The communications unit, in turn, communicates with a remote server through a plurality of different communications modes so as to allow remote access and control of the legacy alarm system.  Communication with a remote server through a plurality of different communications modes to allow remote access and control of a legacy alarm system by a communications unit was not well-understood, routine, or conventional.

73.     The '385 and '736 patents are, therefore, necessarily rooted in home security technology specifically arising in the realm of home security systems at a residence.

74.     A skilled artisan would not consider the claim limitations of the '385 and '736 patents – either alone or in combination – to recite well-understood, routine, or conventional concepts.  Instead, a person of ordinary skill in the art would recognize that the claim limitations

of the '385 and '736 patents are directed to the inventive concepts described in the specification and prosecution history.

### The '871 Patent

75.     On July 2, 2013, the USPTO issued United States Patent No. 8,478,871 ("the '871 patent"), entitled "Gateway Registry Methods and Systems."  Alarm.com's wholly owned subsidiary ICN is the owner and assignee of all right, title, and interest in and to the '871 patent and holds the right to sue and recover damages for infringement thereof, including past damages. A true and correct copy of the '871 patent was attached as Exhibit 4 to the Original Complaint.

76.     During prosecution, the '871 patent overcame rejections based on purported double patenting and indefiniteness.  After overcoming those rejections, the USPTO examiner analyzed all cited references and then allowed the claims of the '871 patent.  In doing so, the examiner explained the closest prior art was U.S. Patent No. 7,082,460 ("Hansen"), which according to the examiner taught the following:

> [E]stablishing a communication between a gateway device at a location and a gateway registry using an address of the gateway registry…; receiving an identification…; sending to a gateway server the identification and receiving in response the information corresponds to the gateway device…; and managing a set of local management devices coupled to the local network and located at the location using the information….

77.     The examiner went on to note that neither Hansen nor any other prior art taught or made obvious the following claimed aspects of the '871 patent:

> Sending a request to the gateway registry specifying a serial number of the gateway device; receiving from the gateway registry an address of the gateway

*server includes an account comprising account information that corresponds to gateway device; receiving an identification of the account; sending to gateway server the identification and receiving in response the account information; and managing a set of local management devices coupled to the local network and located at the location using the account information.*

78.     Stated differently, the '871 patent teaches a novel and non-obvious way of using a gateway in conjunction with a gateway registry, including manufacturing (or programming) the gateway to have a specific serial number that allows the gateway to be uniquely identified by the gateway registry. In the context of, for example, claim 1 of the '871 patent, a gateway having a specific serial number that allows the gateway to uniquely identify itself to the gateway registry was not well-understood, routine, or conventional.

79.     Using the serial number, the gateway registry can identify an address of a gateway server, which has an account associated with the gateway.  In the context of claim 1 of the '871 patent, the identification of an address of a gateway server by a gateway registry using a serial number was not well-understood, routine, or conventional.

80.     The '871 patent therefore improves the operation and efficiency of the gateway registry, which is able to communicate with gateways, even if the gateway is not visible to the gateway registry.  In addition, the gateway servers serve the role of relieving the gateway registry of the computing load associated with communicating with the gateways.

81.     These improvements are specifically rooted in enhancing the interactions between gateways and gateway registries specifically in the context of home security systems.

82.     A skilled artisan would not consider the claim limitations of the '871 patent – either alone or in combination – to recite well-understood, routine, or conventional concepts.

Instead, a person of ordinary skill in the art would recognize that the claim limitations of the '871 patent are directed to the inventive concepts described in the specification and prosecution history.

## The '276 Patent

83.     On September 22, 2015, the USPTO issued United States Patent No. 9,141,276 ("the '276 patent"), entitled "Integrated Interface For Mobile Device."  Alarm.com's wholly owned subsidiary ICN is the owner and assignee of all right, title, and interest in and to the '276 patent and holds the right to sue and recover damages for infringement thereof, including past damages.  A true and correct copy of the '276 patent was attached as Exhibit 5 to the Original Complaint.

84.     The '276 patent generally pertains to improving how a subscriber remotely controls the home security system.  For example, the '276 patent teaches that the mobile device is provided separately from the monitoring system by a company different than the company providing the monitoring system.  This was a significant departure from conventional home security systems, where the means for controlling and monitoring the system was a dedicated device designed specifically, and exclusively, for the home security system.

85.     The '276 patent taught that a generic mobile device, such as a smartphone, could be used to perform the same control and monitoring functions.

86.     To do so, however, required "applications," (or "apps") which are typically compiled computer software for a particular mobile device.  The claimed app of the '276 patent included software capable of performing a synchronization to associate the mobile device with the monitoring system.

87.     The ability to perform this synchronization to obtain an association, in the context of a home security mobile app, was not previously known and presented challenges

accomplished through the teachings of the '276 patent.  In other words, the '276 patent improved the preexisting home security technology (the "monitoring system") to permit a mobile device running an app to perform the same functions previously accomplished through a dedicated control device.

88.     Thus, in the context of the claims of the '276 patent, mobile app software capable of performing a synchronization to associate the mobile device with the monitoring system was not well-understood, routine, or conventional.  Also in the context of the claims of the '276 patent, controlling and monitoring a monitoring system by a mobile device provided separately from the monitoring system by a company different than the company providing the monitoring system was not well-understood, routine, or conventional.

89.     During prosecution, the '276 patent overcame a rejection based on purported double patenting.  After overcoming this rejection, the USPTO examiner analyzed all cited references including U.S. Pub. No. 2006/0271695 ("Lavian") in view of U.S. Pub. No. 2006/0168404 ("Ording").  Lavian disclosed, according to the examiner, "a local area network (LAN), a security system . . . a wide area network and a remote server."  The examiner stated that Ording disclosed a device comprising:

> *a touchscreen at a first location ... wherein the touch screen includes a processor . . . coupled to a local area network (LAN) and a security system at the first location ...; and a plurality of interfaces . . . coupled to the processor and presented to a user via the touch screen, and a remote server at a second location.*

90.     Prosecution counsel argued that neither Ording nor Lavian taught:

*A security system comprising a monitoring system that is configured to monitor a premise, and a mobile device that is provided separately from the monitoring system by a company that is different than a company that provides the monitoring system, the mobile device including applications that, when run on the mobile device, perform operations including performing a synchronization to associate a mobile device with a monitoring system that is configured to monitor a premise, displaying, on a display of the mobile device, a status interface area that includes status information related to the monitoring system based on the received one or more data communications, and displaying, on the display of the mobile device, a control interface area that enables a user to provide user input to control the monitoring system.*

91.     The examiner then issued a Notice of Allowability, noting that no prior art taught or made obvious the following claimed aspects of the '276 patent:

*A security system comprising a monitoring system that is configured to monitor a premise, and a mobile device that is provided separately from the monitoring system by a company that is different than a company that provides the monitoring system, the mobile device including applications that, when run on the mobile device, perform operations including performing a synchronization to associate a mobile device with a monitoring system that is configured to monitor a premise, displaying, on a display of the mobile device, a status interface area that includes status information related to the monitoring system based on the received one or more data communications, and displaying, on the display of the*

*mobile device, a control interface area that enables a user to provide user input*

*to control the monitoring system.*

92.     The '276 patent is specifically rooted in increasing the flexibility for monitoring and controlling a home security system and serves to reduce the hardware costs for subscribers because it obviates the need for a dedicated home security control device.

93.     A skilled artisan would not consider the claim limitations of the '276 patent – either alone or in combination – to recite well-understood, routine, or conventional concepts. Instead, a person of ordinary skill in the art would recognize that the claim limitations of the '276 patent are directed to the inventive concepts described in the specification and prosecution history.

94.     ipDatatel infringes one or more claims of the Patents-in-Suit, literally or under the doctrine of equivalents, under 35 U.S.C. § 271(a)-(c), as alleged below.

## IPDATATEL'S KNOWLEDGE OF THE PATENTS-IN-SUIT

95.     For the reasons discussed herein, ipDatatel either had actual knowledge of the Patents-in-Suit and/or their respective applications prior to this action or willfully blinded itself to the existence of those patents.  In any event, ipDatatel had actual knowledge of the Patents-in-Suit no later than the service of the Original Complaint in this action.

96.     Alarm.com's website (https://www.alarm.com/about/about.aspx) prominently displays at least the '090, '385, '736, '871, and '276 patents.

97.     ipDatatel first obtained knowledge of the '090, '385, '736, '871, and '276 patents prior to this action through the instances of direct competition between Alarm.com and ipDatatel for dealer/service provider accounts, as well as the numerous interactions between the two companies.  Alarm.com and ipDatatel have directly competed for one or more customer (service

-24-

provider) accounts.  During the process of this direct competition, ipDatatel learned of, or willfully blinded itself to the existence of, the '090, '385, '736, '871, and '276 patents.

98.     ipDatatel independently learned about the Patents-in-Suit because it researched Icontrol Networks, Inc. ("Icontrol"), the former owner of four of the Patents-in-Suit, the '385, '736, '871, and '276 patents.  ipDatatel and Icontrol are both members of the Z-Wave Alliance. ipDatatel researched Icontrol not only because of this mutual membership in the Z-Wave Alliance, but moreover because in the past they directly competed for one or more customer accounts.  ipDatatel affirmatively investigated Icontrol and its patent portfolio, at which time ipDatatel learned about at least the '385, '736, '871, and '276 patents.

99.     Icontrol's website (https://www.icontrol.com/patents/) prominently displayed at least the '385, '736, '871, and '276 patents.

100.     ipDatatel further independently learned about at least the '090 patent on account of a patent infringement lawsuit brought by Alarm.com on May 20, 2013, against Telular Corporation, a customer of Icontrol that involved the aforementioned patents.  *Alarm.com Incorporated v. Telular Corporation*, Case No. 1:13-cv-00890 (D. Del.).

101.     ipDatatel learned about the '871 patent in connection with a patent infringement lawsuit Alarm.com brought against Zonoff, Inc. on September 16, 2014 relating to the '871 patent, in addition to other patents related to the Patents-in-Suit, and a second lawsuit brought against Zonoff on November 30, 2015 relating to the '385, '736, and '276 patents.

102.     ipDatatel learned about the '090, '385, and '276 patents in connection with a patent infringement lawsuit Alarm.com brought against SecureNet Technologies LLC and Protect America, Inc. on April 25, 2017 relating to the '090, '385, and '276 patents.

103.     ipDatatel was aware of a publication by Imperial Capital entitled "Security Industry Monitor," dated March 2014.  That publication states that "IControl and Alarm.com Networks have been and remain from our past publications the best known companies providing interactive wireless software platforms to the security and cable-telecom industries."  (emphasis added).

104.     ipDatatel willfully blinded itself to the '090, '385, '736, '871, and '276 patents to the extent that it lacked affirmative knowledge of the Patents-in-Suit prior to this publication and/or failed to investigate Icontrol and Alarm.com, two of the "best known" companies in the applicable industry.

105.     ipDatatel has known of the existence of the '090, '385, '736, '871, and '276 patents, and its acts of infringement have been willful and in disregard for the Patents-in-Suit, without any reasonable basis for believing that it had a right to engage in the infringing conduct.

106.     ipDatatel further attained knowledge of the '090, '385, '736, '871, and '276 patents on or around the time when the Original Complaint in this action was filed.

## FIRST CAUSE OF ACTION: INFRINGEMENT OF THE '090 PATENT

107.     Alarm.com and ICN reallege and incorporate by reference the allegations of all the preceding paragraphs of the Amended Complaint as though fully set forth herein.

108.     Alarm.com is the assignee and sole owner of all right, title, and interest in the '090 patent.

109.     Regarding infringement under 35 U.S.C. § 271(a), Defendant has infringed and continues to infringe at least claim 36 of the '090 patent in this District and elsewhere, by making, using, offering for sale, and/or selling at least the Accused Products within the United States.  Further, end users of the Accused Products within the United States infringe at least

claim 36 of the '090 patent in this District and elsewhere through their use of such Accused Products in accordance with the Defendant's design.  Alarm.com and ICN expect to assert additional claims of the '090 patent.

110.    Regarding infringement under 35 U.S.C. § 271(b), Defendant has caused, urged, encouraged and/or aided and continues to cause, urge, encourage, and/or aid third parties (*e.g.*, end users, retailers, service providers, consumer electronics OEMs, and system integrators) to directly infringe one or more claims of the '090 patent.  These actions include, but are not limited to: advertising the Accused Products and their infringing use; establishing distribution channels for these Accused Products in the United States; drafting, distributing, or making available datasheets, instructions, or manuals for the Accused Products to Defendant's customers and prospective customers; and/or providing technical support or other services for the Accused Products to Defendant's customers and prospective customers.  Defendant has taken these actions with full knowledge of the '090 patent, and acted with the specific intent to induce one or more of these third parties to infringe the '090 patent.  These third-parties in fact have directly infringed the '090 patent by making, using, offering to sell, and/or selling products containing, using, or incorporating the Accused Products.

111.    On information and belief, Defendant transferred corporate assets to and/or merged with a recently formed parent company, IPR, Inc. ("IPR").  Through this transaction and related dealings, Defendant has caused, urged, encouraged and/or aided and continues to cause, urge, encourage, and/or aid IPR and its customers (including end users) to directly infringe one or more claims of the '090 patent.  Thus, direct infringement by IPR and/or its customers was caused by Defendant's inducement.

112.    Regarding infringement under 35 U.S.C. § 271(c), Defendant has contributed and continues to contribute to infringement by selling, offering to sell, and/or importing the Accused Products and related components to third parties (*e.g.*, end users, retailers, service providers, consumer electronics OEMs, and system integrators).  These third parties then make, use, sell, or offer to sell products, devices, or systems that incorporate the Accused Products and related components and use the Accused Products and related components to practice the claimed inventions of the '090 patent.  Thus, the Accused Products and their related components constitute material parts of the '090 patent.  Moreover, the third parties' actions constitute direct infringement of the '090 patent.

113.    On information and belief, Defendant transferred Accused Products and components thereof, including certain source code, executable code, and/or computer infrastructure (including cloud-based accounts) to IPR for servers and/or mobile applications in connection with an asset transfer, merger, or other transaction.  Defendant did so to allow IPR to make, use, sell, or offer to sell products, devices, or systems that incorporate the Accused Products and related components and use the Accused Products and related components to practice the claimed inventions of the '090 patent.  The Accused Products and their related components constitute material parts of the '090 patent.  Thus, Defendant has contributed to direct infringement by IPR and/or its customers under 35 U.S.C. § 271(c).

114.    Defendant knows, for the reasons described above, that the Accused Products and related components are especially made and/or especially adapted for use in infringing the '090 patent.  Moreover, these components and apparatuses are not staple articles of commerce suitable for substantial non-infringing use, at least because the Accused Products and related components have no use apart from making and/or using the inventions as claimed in the '090 patent.  For

example and without limitation, the Accused Products are used only in conjunction with or as part of the claimed apparatuses and methods.

115.    Unless enjoined by this Court, Defendant will continue to infringe the '090 patent, and Alarm.com and ICN will continue to suffer irreparable harm for which there is no adequate remedy at law.  Accordingly, Alarm.com and ICN are entitled to permanent injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

116.    Defendant's infringement of the '090 patent has been, and continues to be knowing, intentional, and willful.

117.    Alarm.com and ICN have and will continue to suffer damages as a result of Defendant's infringement of the '090 patent, and are entitled to compensation for such damages pursuant to 35 U.S.C. § 284 in an amount to be determined at trial.

**SECOND CAUSE OF ACTION: INFRINGEMENT OF THE '385 PATENT**

118.    Alarm.com and ICN reallege and incorporate by reference the allegations of all the preceding paragraphs of the Amended Complaint as though fully set forth herein.

119.    Alarm.com's wholly owned subsidiary ICN is the assignee and sole owner of all right, title, and interest in the '385 patent.

120.    Regarding infringement under 35 U.S.C. § 271(a), Defendant has infringed and continues to infringe at least claim 1 of the '385 patent in this District and elsewhere, by making, using, offering for sale, and/or selling at least the Accused Products within the United States. Further, end users of the Accused Products within the United States infringe at least claim 1 of the '385 patent in this District and elsewhere through their use of such Accused Products in accordance with the Defendant's design.  Alarm.com and ICN expect to assert additional claims of the '385 patent.

121. Regarding infringement under 35 U.S.C. § 271(b), Defendant has caused, urged, encouraged and/or aided and continues to cause, urge, encourage, and/or aid third parties (*e.g.*, end users, retailers, service providers, consumer electronics OEMs, and system integrators) to directly infringe one or more claims of the '385 patent. These actions include, but are not limited to: advertising the Accused Products and their infringing use; establishing distribution channels for these Accused Products in the United States; drafting, distributing, or making available datasheets, instructions, or manuals for the Accused Products to Defendant's customers and prospective customers; and/or providing technical support or other services for the Accused Products to Defendant's customers and prospective customers. Defendant has taken these actions with full knowledge of the '385 patent, and acted with the specific intent to induce one or more of these third parties to infringe the '385 patent. These third-parties in fact have directly infringed the '385 patent by making, using, offering to sell, and/or selling products containing, using, or incorporating the Accused Products.

122. On information and belief, Defendant transferred corporate assets to and/or merged with a recently formed parent company, IPR. Through this transaction and related dealings, Defendant has caused, urged, encouraged and/or aided and continues to cause, urge, encourage, and/or aid IPR and its customers (including end users) to directly infringe one or more claims of the '385 patent. Thus, direct infringement by IPR and/or its customers was caused by Defendant's inducement.

123. Regarding infringement under 35 U.S.C. § 271(c), Defendant has contributed and continues to contribute to infringement by selling, offering to sell, and/or importing the Accused Products and related components to third parties (*e.g.*, end users, retailers, service providers, consumer electronics OEMs, and system integrators). These third parties then make, use, sell, or

offer to sell products, devices, or systems that incorporate the Accused Products and related

components and use the Accused Products and related components to practice the claimed

inventions of the '385 patent.  Thus, the Accused Products and their related components

constitute material parts of the '385 patent.  Moreover, the third parties' actions constitute direct

infringement of the '385 patent.

124.    On information and belief, Defendant transferred Accused Products and

components thereof, including certain source code, executable code, and/or computer

infrastructure (including cloud-based accounts) to IPR for servers and/or mobile applications in

connection with an asset transfer, merger, or other transaction.  Defendant did so to allow IPR to

make, use, sell, or offer to sell products, devices, or systems that incorporate the Accused

Products and related components and use the Accused Products and related components to

practice the claimed inventions of the '385 patent.  The Accused Products and their related

components constitute material parts of the '385 patent.  Thus, Defendant has contributed to

direct infringement by IPR and/or its customers under 35 U.S.C. § 271(c).

125.    Defendant knows, for the reasons described above, that the Accused Products and

related components are especially made and/or especially adapted for use in infringing the '385

patent.  Moreover, these components and apparatuses are not staple articles of commerce suitable

for substantial non-infringing use, at least because the Accused Products and related components

have no use apart from making and/or using the inventions as claimed in the '385 patent.  For

example and without limitation, the Accused Products are used only in conjunction with or as

part of the claimed apparatuses and methods.

126.    Unless enjoined by this Court, Defendant will continue to infringe the '385 patent,

and Alarm.com and ICN will continue to suffer irreparable harm for which there is no adequate

remedy at law.  Accordingly, Alarm.com and ICN are entitled to permanent injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

127.     Defendant's infringement of the '385 patent has been, and continues to be knowing, intentional, and willful.

128.     Alarm.com and ICN have and will continue to suffer damages as a result of Defendant's infringement of the '385 patent, and are entitled to compensation for such damages pursuant to 35 U.S.C. § 284 in an amount to be determined at trial.

## THIRD CAUSE OF ACTION: INFRINGEMENT OF THE '736 PATENT

129.     Alarm.com and ICN reallege and incorporate by reference the allegations of all the preceding paragraphs of the Amended Complaint as though fully set forth herein.

130.     Alarm.com's wholly owned subsidiary ICN is the assignee and sole owner of all right, title, and interest in the '736 patent.

131.     Regarding infringement under 35 U.S.C. § 271(a), Defendant has infringed and continues to infringe at least claim 1 of the '736 patent in this District and elsewhere, by making, using, offering for sale, and/or selling at least the Accused Products within the United States. Further, end users of the Accused Products within the United States infringe at least claim 1 of the '736 patent in this District and elsewhere through their use of such Accused Products in accordance with the Defendant's design.  Alarm.com and ICN expect to assert additional claims of the '736 patent.

132.     Regarding infringement under 35 U.S.C. § 271(b), Defendant has caused, urged, encouraged and/or aided and continues to cause, urge, encourage, and/or aid third parties (*e.g.*, end users, retailers, service providers, consumer electronics OEMs, and system integrators) to directly infringe one or more claims of the '736 patent.  These actions include, but are not

limited to: advertising the Accused Products and their infringing use; establishing distribution channels for these Accused Products in the United States; drafting, distributing, or making available datasheets, instructions, or manuals for the Accused Products to Defendant's customers and prospective customers; and/or providing technical support or other services for the Accused Products to Defendant's customers and prospective customers.  Defendant has taken these actions with full knowledge of the '736 patent, and acted with the specific intent to induce one or more of these third parties to infringe the '736 patent.  These third-parties in fact have directly infringed the '736 patent by making, using, offering to sell, and/or selling products containing, using, or incorporating the Accused Products.

133.    On information and belief, Defendant transferred corporate assets to and/or merged with a recently formed parent company, IPR.  Through this transaction and related dealings, Defendant has caused, urged, encouraged and/or aided and continues to cause, urge, encourage, and/or aid IPR and its customers (including end users) to directly infringe one or more claims of the '736 patent.  Thus, direct infringement by IPR and/or its customers was caused by Defendant's inducement.

134.    Regarding infringement under 35 U.S.C. § 271(c), Defendant has contributed and continues to contribute to infringement by selling, offering to sell, and/or importing the Accused Products and related components to third parties (*e.g.*, end users, retailers, service providers, consumer electronics OEMs, and system integrators).  These third parties then make, use, sell, or offer to sell products, devices, or systems that incorporate the Accused Products and related components and use the Accused Products and related components to practice the claimed inventions of the '736 patent.  Thus, the Accused Products and their related components

constitute material parts of the '736 patent.  Moreover, the third parties' actions constitute direct infringement of the '736 patent.

135.    On information and belief, Defendant transferred Accused Products and components thereof, including certain source code, executable code, and/or computer infrastructure (including cloud-based accounts) to IPR for servers and/or mobile applications in connection with an asset transfer, merger, or other transaction.  Defendant did so to allow IPR to make, use, sell, or offer to sell products, devices, or systems that incorporate the Accused Products and related components and use the Accused Products and related components to practice the claimed inventions of the '736 patent.  The Accused Products and their related components constitute material parts of the '736 patent.  Thus, Defendant has contributed to direct infringement by IPR and/or its customers under 35 U.S.C. § 271(c).

136.    Defendant knows, for the reasons described above, that the Accused Products and related components are especially made and/or especially adapted for use in infringing the '736 patent.  Moreover, these components and apparatuses are not staple articles of commerce suitable for substantial non-infringing use, at least because the Accused Products and related components have no use apart from making and/or using the inventions as claimed in the '736 patent.  For example and without limitation, the Accused Products are used only in conjunction with or as part of the claimed apparatuses and methods.

137.    Unless enjoined by this Court, Defendant will continue to infringe the '736 patent, and Alarm.com and ICN will continue to suffer irreparable harm for which there is no adequate remedy at law.  Accordingly, Alarm.com and ICN are entitled to permanent injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

138.  Defendant's infringement of the '736 patent has been, and continues to be knowing, intentional, and willful.

139.  Alarm.com and ICN have and will continue to suffer damages as a result of Defendant's infringement of the '736 patent, and are entitled to compensation for such damages pursuant to 35 U.S.C. § 284 in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION: INFRINGEMENT OF THE '871 PATENT

140.  Alarm.com and ICN reallege and incorporate by reference the allegations of all the preceding paragraphs of the Amended Complaint as though fully set forth herein.

141.  Alarm.com's wholly owned subsidiary ICN is the assignee and sole owner of all right, title, and interest in the '871 patent.

142.  Regarding infringement under 35 U.S.C. § 271(a), Defendant has infringed and continues to infringe at least claim 15 of the '871 patent in this District and elsewhere, by making, using, offering for sale, and/or selling at least the Accused Products within the United States.  Further, end users of the Accused Products within the United States infringe at least claim 15 of the '871 patent in this District and elsewhere through their use of such Accused Products in accordance with the Defendant's design.  Alarm.com and ICN expect to assert additional claims of the '871 patent.

143.  Regarding infringement under 35 U.S.C. § 271(b), Defendant has caused, urged, encouraged and/or aided and continues to cause, urge, encourage, and/or aid third parties (*e.g.*, end users, retailers, service providers, consumer electronics OEMs, and system integrators) to directly infringe one or more claims of the '871 patent.  These actions include, but are not limited to: advertising the Accused Products and their infringing use; establishing distribution channels for these Accused Products in the United States; drafting, distributing, or making

available datasheets, instructions, or manuals for the Accused Products to Defendant's customers and prospective customers; and/or providing technical support or other services for the Accused Products to Defendant's customers and prospective customers. Defendant has taken these actions with full knowledge of the '871 patent, and acted with the specific intent to induce one or more of these third parties to infringe the '871 patent. These third-parties in fact have directly infringed the '871 patent by making, using, offering to sell, and/or selling products containing, using, or incorporating the Accused Products.

144.     On information and belief, Defendant transferred corporate assets to and/or merged with a recently formed parent company, IPR. Through this transaction and related dealings, Defendant has caused, urged, encouraged and/or aided and continues to cause, urge, encourage, and/or aid IPR and its customers (including end users) to directly infringe one or more claims of the '871 patent. Thus, direct infringement by IPR and/or its customers was caused by Defendant's inducement.

145.     Regarding infringement under 35 U.S.C. § 271(c), Defendant has contributed and continues to contribute to infringement by selling, offering to sell, and/or importing the Accused Products and related components to third parties (*e.g.*, end users, retailers, service providers, consumer electronics OEMs, and system integrators). These third parties then make, use, sell, or offer to sell products, devices, or systems that incorporate the Accused Products and related components and use the Accused Products and related components to practice the claimed inventions of the '871 patent. Thus, the Accused Products and their related components constitute material parts of the '871 patent. Moreover, the third parties' actions constitute direct infringement of the '871 patent.

146.     On information and belief, Defendant transferred Accused Products and components thereof, including certain source code, executable code, and/or computer infrastructure (including cloud-based accounts) to IPR for servers and/or mobile applications in connection with an asset transfer, merger, or other transaction.  Defendant did so to allow IPR to make, use, sell, or offer to sell products, devices, or systems that incorporate the Accused Products and related components and use the Accused Products and related components to practice the claimed inventions of the '871 patent.  The Accused Products and their related components constitute material parts of the '871 patent.  Thus, Defendant has contributed to direct infringement by IPR and/or its customers under 35 U.S.C. § 271(c).

147.     Defendant knows, for the reasons described above, that the Accused Products and related components are especially made and/or especially adapted for use in infringing the '871 patent.  Moreover, these components and apparatuses are not staple articles of commerce suitable for substantial non-infringing use, at least because the Accused Products and related components have no use apart from making and/or using the inventions as claimed in the '871 patent.  For example and without limitation, the Accused Products are used only in conjunction with or as part of the claimed apparatuses and methods.

148.     Unless enjoined by this Court, Defendant will continue to infringe the '871 patent, and Alarm.com and ICN will continue to suffer irreparable harm for which there is no adequate remedy at law.  Accordingly, Alarm.com and ICN are entitled to permanent injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

149.     Defendant's infringement of the '871 patent has been, and continues to be knowing, intentional, and willful.

150.    Alarm.com and ICN have and will continue to suffer damages as a result of Defendant's infringement of the '871 patent, and are entitled to compensation for such damages pursuant to 35 U.S.C. § 284 in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION: INFRINGEMENT OF THE '276 PATENT**

151.    Alarm.com and ICN reallege and incorporate by reference the allegations of all the preceding paragraphs of the Amended Complaint as though fully set forth herein.

152.    Alarm.com's wholly owned subsidiary ICN is the assignee and sole owner of all right, title, and interest in the '276 patent.

153.    Regarding infringement under 35 U.S.C. § 271(a), Alarm.com and ICN are informed and believe, and thereon allege, that Defendant has infringed and continue to infringe at least claim 1 of the '276 patent in this District and elsewhere, by making, using, offering for sale, and/or selling at least the Accused Products within the United States.  Further, on information and belief, end users of the Accused Products within the United States infringe at least claim 1 of the '276 patent in this District and elsewhere through their use of such Accused Products in accordance with the Defendant's design. Alarm.com and ICN expect to assert additional claims of the '276 patent.

154.    Regarding infringement under 35 U.S.C. § 271(b), Alarm.com and ICN are informed and believe that Defendant has caused, urged, encouraged and/or aided and continues to cause, urge, encourage, and/or aid third parties (*e.g.*, end users, retailers, service providers, consumer electronics OEMs, and system integrators) to directly infringe one or more claims of the '276 patent.  These actions include, but are not limited to: advertising the Accused Products and their infringing use; establishing distribution channels for these Accused Products in the United States; drafting, distributing, or making available datasheets, instructions, or manuals for

the Accused Products to Defendant's customers and prospective customers; and/or providing technical support or other services for the Accused Products to Defendant's customers and prospective customers.  On information and belief, Defendant has taken these actions with full knowledge of the '276 patent, and acted with the specific intent to induce one or more of these third parties to infringe the '276 patent.  On information and belief, these third-parties in fact have directly infringed the '276 patent by making, using, offering to sell, and/or selling products containing, using, or incorporating the Accused Products.

155.    On information and belief, Defendant transferred corporate assets to and/or merged with a recently formed parent company, IPR.  Through this transaction and related dealings, Defendant has caused, urged, encouraged and/or aided and continues to cause, urge, encourage, and/or aid IPR and its customers (including end users) to directly infringe one or more claims of the '276 patent.  Thus, direct infringement by IPR and/or its customers was caused by Defendant's inducement.

156.    Regarding infringement under 35 U.S.C. § 271(c), Alarm.com and ICN are informed and believe that Defendant has contributed and continues to contribute to infringement by selling, offering to sell, and/or importing the Accused Products and related components to third parties (*e.g.*, end users, retailers, service providers, consumer electronics OEMs, and system integrators).  These third parties then make, use, sell, or offer to sell products, devices, or systems that incorporate the Accused Products and related components and use the Accused Products and related components to practice the claimed inventions of the '276 patent.  Thus, the Accused Products and their related components constitute material parts of the '276 patent.  Moreover, the third parties' actions constitute direct infringement of the '276 patent.

157.     On information and belief, Defendant transferred Accused Products and components thereof, including certain source code, executable code, and/or computer infrastructure (including cloud-based accounts) to IPR for servers and/or mobile applications in connection with an asset transfer, merger, or other transaction.  Defendant did so to allow IPR to make, use, sell, or offer to sell products, devices, or systems that incorporate the Accused Products and related components and use the Accused Products and related components to practice the claimed inventions of the '276 patent.  The Accused Products and their related components constitute material parts of the '276 patent.  Thus, Defendant has contributed to direct infringement by IPR and/or its customers under 35 U.S.C. § 271(c).

158.     Upon information and belief, Defendant knows, for the reasons described above, that the Accused Products and related components are especially made and/or especially adapted for use in infringing the '276 patent.  Moreover, these components and apparatuses are not staple articles of commerce suitable for substantial non-infringing use, at least because the Accused Products and related components have no use apart from making and/or using the inventions as claimed in the '276 patent.  For example and without limitation, the Accused Products are used only in conjunction with or as part of the claimed apparatuses and methods.

159.     Alarm.com and ICN are informed and believe, and thereon allege, that unless enjoined by this Court, Defendant will continue to infringe the '276 patent, and Alarm.com and ICN will continue to suffer irreparable harm for which there is no adequate remedy at law.  Accordingly, Alarm.com and ICN are entitled to permanent injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

160.     Alarm.com and ICN are informed and believe that Defendant's infringement of the '276 patent has been, and continues to be knowing, intentional, and willful.

161.    Alarm.com and ICN have and will continue to suffer damages as a result of Defendant's infringement of the '276 patent, and are entitled to compensation for such damages pursuant to 35 U.S.C. § 284 in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Alarm.com and ICN pray that this Court:

a.    Declare that Defendant has infringed one or more claims of each of the Patents-in-Suit;

b.    Permanently enjoin Defendant and its officers, agents, representatives, distributors, wholesalers, retailers, licensees, servants, employees, attorneys, successors, assigns, parent or subsidiary corporations, and affiliates, and all persons acting in active concert or participation with Defendant, from infringing, inducing others to infringe, or contributing to the infringement of the Patents-in-Suit;

c.    Award Alarm.com and ICN damages in an amount adequate to compensate Alarm.com and ICN for Defendant's acts of infringement, including without limitation on the basis of a reasonable royalty and for lost profits, together with interest thereon, in an amount to be proven at trial, in accordance with 35 U.S.C. §§ 154(d) and 284;

d.    Find that this case is exceptional and award Alarm.com and ICN an amount up to three times the actual amount assessed, pursuant to 35 U.S.C. § 284;

e.    Find that this case is exceptional and award Alarm.com and ICN their respective costs and expenses for Defendant's infringement, including reasonable attorneys' fees, in accordance with the provisions of 35 U.S.C. § 285 or other statutes;

f.    Award Alarm.com and ICN pre-judgment and post-judgment interest at the highest rates allowed by law; and

g.      Award Alarm.com and ICN any other relief, in law and in equity, to which

the Court finds Alarm.com and ICN are justly entitled.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Civil Rule CV-38 of

the Local Rules of the United States District Court for the Eastern District of Texas, Alarm.com

and ICN demand a trial by jury of this action.

Dated:  February 21, 2018                    _/s/ Ryan R. Smith_____

James C. Yoon (CA State Bar No. 177155)
jyoon@wsgr.com
Ryan R. Smith (CA State Bar No. 229323)
rsmith@wsgr.com
Mary Procaccio-Flowers (CA State Bar No. 286936)
mprocaccioflowers@wsgr.com
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Fax: (650) 493-6811

Lisa D. Zang (*pro hac vice* to be submitted)
lzang@wsgr.com
WILSON SONSINI GOODRICH & ROSATI, P.C.
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
323-210-2900

G. Blake Thompson (State Bar No. 24042033)
blake@themannfirm.com
J. Mark Mann (State Bar No. 12926150)
mark@themannfirm.com
MANN | TINDEL | THOMPSON
300 West Main Street
Henderson, Texas 75652
(903) 657-8540
(903) 657-6003 (fax)

*Attorneys for Plaintiffs Alarm.com*
*Incorporated and ICN Acquisition, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3). Any other counsel of record will be served by a facsimile transmission and/or first class mail, on this the 21st day of February, 2018.

 */s/ Ryan R. Smith*
Ryan R. Smith
